IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MR. DAVID A. NAYAK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No: 08 C 634 |
| ) | |
| NATIONAL BOARD OF MEDICAL ) | Judge James B. Zagel |
| EXAMINERS, ) | |
| ) | Magistrate Judge Brown |
| ) | |
| Defendant. ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION**

**I.    INTRODUCTION.**

David A. Nayak ("Mr. Nayak" or "Plaintiff") is a medical student at the University of Illinois at Chicago – College of Medicine ("UIC")[1] and has disabilities protected by Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 ("ADA").  Mr. Nayak has Attention Deficit Hyperactivity Disorder ("ADHD"), Hashimoto's Thyroiditis ("Hashimoto's"), and Chronic Fatigue Syndrome, secondary to Chronic-Reactive Mononucleosis ("Chronic Mono").  These impairments substantially limit him in the major life activies of  reading, thinking and concentrating and are particulary manifest in timed testing situations.

To progress in medical school, standarized tests admistered by the National Board of Medical Examiners ("NBME") are required.  Accordingly, to address his disabilities, in April 2007, Mr. Nayak requested testing accommodations from the NBME in connection with the United States Medical Licensing Examination ("USMLE") Step 1.  Specifically, Mr. Nayak requested extended test taking time (double time), an isolated testing environment, and appropriately monitored break periods.  Mr. Nayak supplied the NBME with substantial documentation of his disabilities as part of the request process, as well as with information as to how the accomodations requested would enable him to

---

[1] Mr. Nayak successfully completed his first two years of medical school at UIC in May 2007.

compete fairly with other non-disabled persons taking the test.[2]  However, on December 3, 2007, the NBME rejected Mr. Nayak's final request and granted only a single, inadequate, testing accommodation, i.e., "additional break time" over two days.

Mr. Nayak is currently scheduled to take the USMLE Step 1 on February 21, 2008 and will not be able to begin his third year of medical school in March of 2008 without having taken the exam. (ADN, ¶¶ 54, 55; Exs. Z, AA.)  Further, Mr. Nayak will not be able to progress through his third year of medical school without passing the USMLE Step 1.

Mr. Nayak seeks injunctive relief requiring the NBME to allow him to take the USMLE Step 1 with the requested accommodations.  As we show below, he meets the standards for the issuance of a preliminary injunction.  See, Ty, Inc. v. The Jones Group, Inc., 237 F.3d 891, 895 (7th Cir. 2001). First, he has more than "some" likelihood of succeeding on his claim that he has a disability under the ADA and that the NBME has refused to provide him with reasonable accomodations as required by Title III of the ADA, and thus has been discriminated against within the meaning of that Act.  Second, he will suffer irreparable harm and has no adequate remedy at law if he is denied such testing accommodations and must take the test on February 21 without them.  Third, the balancing of hardships favors granting Mr. Nayak preliminary injunctive relief.  Finally, granting the relief is in the public interest.  Ty, Inc., 237 F.3d at 895.

## II.    STATEMENT OF FACTS.

Mr. Nayak has a lengthy history of ADHD, evidenced by multiple psychological evaluations,[3] prescribed medications[4] and testing accommodations requested and received based upon his ADHD in

---

2  Mr. Nayak's initial application for testing accommodations in April 2007 included:  a request for USMLE testing accommodations; 2 physician letters of support; 5 separate psychological evaluations (1985, 1997, 2001, 2002 and 2007); an August 2006 medical evaluation; laboratory results from October 2005 to January 2007; 7 physician letters of support for testing accommodations requested from 2002 to 2007; 9 letters from his college, medical school and the Association of Medical Colleges granting or verifying his requested accommodations from 1999 to 2007; and his MCAT, SAT and ACT standardized test results from 1994 to 2003. (Affidavit of David A. Nayak ("ADN"), ¶ 36.)  Pursuant to the NBME's request, in August 2007, Mr. Nayak provided additional information, including:  a personal statement; a July 2007 attorney letter of support; a July 2007 letter from his high school evidencing historical testing accommodations; a June 2007 letter from his medical school reflecting a medical leave of absence; 1995-1998 high school evaluations; 2006 letters awarding AAAAI grant and subsequent resignation from AAAAI program; AAMC Tables of MCAT Re-Testers; graduate school transcript and writing sample; and 1985 and 1997 psychological evaluations.  (ADN, ¶ 38.)
3  08/97 Psychological Evaluation, by Eric M. Ward, Ph.D. (ADN, ¶ 13, Ex. E); 01/01 Multi-Disciplinary Evaluation, by Felicitas S. Sebastian, Ph.D. (ADN, ¶ 22, Ex. I); 07/02 Psycho-Educational Evaluation, by

high school,[5] college[6] and medical school.[7]  Because of his ADHD, Mr. Nayak must spend much more time and effort to read, understand and comprehend written materials than the average person.[8]  (ADN, ¶¶ 3, 9, 20, 45, 46.)  Furthermore, in his adult life, Mr. Nayak remains easily distracted and has trouble keeping attention on specific tasks.  (ADN, ¶¶ 19, 20, 44, 47, 48, 56.)

Unlike others, Mr. Nayak cannot easily absorb a paragraph of information when he reads it; instead he must focus all of his attention on whatever he is reading for a substantial amount of time and repeatedly re-read the information in order to understand what it is that he is reading.  This is particularly true for more dense materials, such as the materials Mr. Nayak is required to read for the USMLE Step 1. (ADN, ¶ 47, Ex. X.)  Thus, the accommodations provided by the NBME, more break time, do nothing to address Mr. Nayak's disabilities – he needs more time to read the questions in the examination.

Mr. Nayak was diagnosed with Attention Deficit Disorder ("ADD") in 1997, before entering the twelfth grade.[9]  (ADN, ¶ 13, Ex. E.)  At the time, his doctor stated that Mr. Nayak "appears to have

---

Pamela R. Dwyer, LCPC, CRC and Mel French, Psy.D., CADC. (ADN, ¶ 23, Ex. J); 03/07 Psychological Report, by Abby Watson, B.S., W. Joel Schneider, Ph.D., and Mark E. Swerdlik, Ph.D., ABPP (Affidavit of William Joel Schneider, Ph.D. ("AWS"), ¶ 11, Ex. B).

[4] Wellbutrin, 150 mg, twice a day (1997-2000) (ADN, ¶ 14); Adderall, 10 mg, twice a day (2000-2004) (ADN, ¶ 21); Adderall XR (extended release tablet), 20mg, once a day (2004) (discontinued after one month due to negative side effects) (ADN, ¶ 26); Adderall, 10 mg, twice a day (2004-10/05) (ADN, ¶ 26); Adderall, 15 mg (a.m. dosage)/7.5 mg (p.m. dosage) (11/05-present) (ADN, ¶ 29).

[5] 1997-1998 academic year, high school examinations (untimed with an isolated testing environment) (ADN, ¶ 16, Ex. F); 10/97, SAT I (extended time) (ADN, ¶ 16, Ex. F); 11/97, SAT II Writing (untimed) (ADN, ¶ 17, Ex. G, p 2);  11/97, SAT II Math Level 1C and SAT II Spanish (extended time) (ADN, ¶ 16, Ex. F); 12/97, SAT I (extended time) (ADN, ¶ 17, Ex. G, p 4);  01/98, SAT II Math Level 2C and SAT II Writing (extended time) (ADN, ¶ 16, Ex. F);  02/98, ACT (extended time with an isolated testing environment) (ADN, ¶¶ 16, 17; Exs. F, G, p 4).

[6] 1999-2003, college examinations (time and a half and double time with an isolated testing environment) (ADN, ¶ 18, Ex. H);  04/03, MCAT (time and a half with an isolated testing environment) (ADN, ¶ 25, Ex. L.); 08/04, MCAT (time and a half with an isolated testing environment) (ADN, ¶ 24, Ex. K).

[7] 09/05-02/06, medical school exams (time and a half with an isolated testing environment) (ADN, ¶ 27, Ex. M);  02/06-05/07, medical school exams (double time with an isolated testing environment) (Mr. Nayak's testing accommodations on medical school exams were increased by UIC to double time starting in February 2006 due to Mr. Nayak's Hashimoto's Thyroiditis) (ADN, ¶ 33, Ex. Q).

[8] Mr. Nayak's ADHD symptoms are not solely related to his abilities to read and comprehend, they also manifest in other ways.  For example, as a child, Mr. Nayak was hyperactive, disruptive and had trouble following rules. (Dr. Anjuli Nayak Affidavit, ¶¶ 3, 4.)

[9] Mr. Nayak exhibited symptoms of ADD before 1997.  For example, Mr. Nayak's elementary school teachers indicated that he needed to improve his self control, observation of rules and listening habits (ADN, ¶ 6, Ex. A, p

an attention deficit that has been masked by his intelligence, very high motivation, and situational factors in his educational programs over the years," and found it "telling" that Mr. Nayak "spends some six hours per night in study while most peers spend two hours." (ADN, ¶ 13, Ex. E, p 3.) Mr. Nayak's high school report cards also reflect his difficulties with ADHD. (ADN, ¶ 10, Ex. B.) For example, Mr. Nayak's tenth grade history teacher noted that "[Mr. Nayak] needs…to concentrate on grasping things clearly, not just understanding the general substance of his reading."[10] As a result of his diagnosis, Mr. Nayak was prescribed Wellbutrin, which helped to control some of his ADD symptoms, and he began taking other steps to control his symptoms. (ADN, ¶¶ 14, 15.)

In 2001 and 2002, Mr. Nayak was diagnosed with "Attention Deficit Hyperactivity Disorder, Combined" and "Attention-Deficit/Hyperactivity Disorder – Residual Adult Form," respectively in two separate evaluations by different doctors. (ADN, ¶¶ 22, 23; Exs. I, J.) Mr. Nayak's 2002 Evaluation report noted that "[a]llowing [Mr. Nayak]…to re-read each of the passages dramatically improved his comprehension." These results demonstrate that although Mr. Nayak can eventually read and comprehend what he is reading in untimed situations, "he experiences significant deficits in comprehension and must read and re-read material in order to acquire expected levels of understanding and retention of what he has read."[11] (ADN, ¶ 23, Ex. J, p 3-4.)

Standardized testing became increasingly important to Mr. Nayak in high school as he hoped to attend college, and the impact of his disabilities became increasingly apparent. Prior to his being diagnosed with ADHD, Mr. Nayak took the SAT I and various SAT II examinations without requesting any testing accommodations.[12] Once he was diagnosed, however, he began requesting and receiving testing accommodations during his senior year of high school on both standardized tests and in his high

---

1) and that "[h]e needs to be careful not to rush through assignments without checking them." (ADN, ¶ 6, Ex. A, p 2).

10  Mr. Nayak's other high school teachers noted that "[w]hile [Mr. Nayak] still go[t] the right answer, his method often took more time and was prone to more careless errors" (ADN, ¶ 10, Ex. B, p 2) and that "[he] faltered at times in grasping factual aspects of the reading and more advanced points of grammar. Carelessness is to blame for much of this weakness" (ADN, ¶ 10, Ex. B, p 4).

[11] Mr. Nayak took his prescribed dosage of Adderall before undergoing testing for both evaluations; however, the medication did not impact the evaluation such that the effects on reading of Mr. Nayak's ADHD were mitigated.
12  These non-accommodated exams included: SAT I (10/94); SAT II Writing, SAT II Math Level I, and SAT II American History/Social Studies (11/94); SAT I (December 1994); SAT I (01/95); PSAT/NMSQT (1995); SAT I (12/96); SAT II Math Level 1C and SAT II Biology (05/97). (ADN, ¶ 11, Exs. C, D.)

school classes based upon his disabilities. (ADN, ¶¶ 16, 17; Exs. F, G.) The differences in Mr. Nayak's test scores when he was examined in an unaccommodated fashion versus when he was examined in an accommodated fashion are notable. For example, after receiving extended time to take the college entrance exams, Mr. Nayak's best unaccommodated SAT I score jumped by 170 points, his unaccommodated SAT II Writing score jumped by 310 points, and his unaccommodated SAT II Math Level 1C jumped by 90 points. (ADN, ¶ 11, Ex. D.)

Following this pattern, in college and medical school Mr. Nayak requested and received the testing accommodations of extended time along with an isolated testing environment on his exams to address his disabilities. (ADN, ¶¶ 18, 27, 33; Exs. H, M, Q.) Mr. Nayak also received testing accommodations for the MCAT by the Association of American Medical Colleges ("AAMC"). His request was initially denied, which resulted in his receiving an examination score in the 10th percentile. (ADN, ¶ 24, Ex. K.) Upon re-review of Mr. Nayak's accommodation request, the AAMC granted him the requested accommodations because "independent external review" had found "evidence of difficulties with memory in support of providing accommodations." [13] (ADN, ¶ 25, Ex. L.) When Mr. Nayak subsequently took the MCAT in an accommodated fashion, his scores jumped from the 10th percentile to the 46th Percentile and subsequently the 66th Percentile. (ADN, ¶ 24, Ex. K.)

In early 2007, Mr. Nayak was given a psychoeducational evaluation in connection with his request for testing accommodations on the USMLE Step 1.[14] (AWS, ¶ 11, Ex. B.) Mr. Nayak's evaluation included a battery of tests to obtain a basic measure of his intelligence and his academic abilities along with a clinical interview. (AWS, ¶ 10.) One of the tests administered was the Nelson-Denny Reading Test ("Nelson-Denny"), which is a commonly used test in the assessment of adults' reading difficulties. (AWS, ¶ 20.) The Nelson-Denny is a timed test focused on reading comprehension and rate. (AWS, ¶¶ 19, 23.) Mr. Nayak scored in the "low average range" with respect to reading comprehension and reading rate on the test. (AWS, ¶ 19.) In revealing contrast, during the same evaluation, Mr. Nayak scored in the "high average range" on the reading comprehension sub-test of the Wechsler Individual Achievement Test II, which is an un-timed test related to reading

---

13 Mr. Nayak received time and a half with an isolated testing environment on the MCAT. (ADN, ¶ 25, Ex. L.)
14 Mr. Nayak had taken his prescribed amount of Adderall before undergoing the evaluation. (AWS, ¶ 11, Ex. B, p 4.)

comprehension. (AWS, ¶ 18.) The 2007 Evaluation report ultimately concluded that Mr. Nayak should receive testing accommodations (extended time) on the USMLE Step 1 under the ADA. (AWS, ¶ 28.)

In October 2005, Mr. Nayak began experiencing extreme malaise, hyper-somnolence, lack of focus and energy and muscle weakness and was subsequently diagnosed with Hashimoto's and Acute Mononucleosis. (ADN, ¶ 28, Ex. N.) Based upon these illnesses, Mr. Nayak requested and received additional testing accommodations on his medical school exams.[15] (ADN, ¶ 33, Ex. Q.) Mr. Nayak successfully finished his first year of medical school and his health began to improve. However, in July of 2006, he again began experiencing continuous extreme fatigue and dramatic unintentional weight loss (30 pounds in a three month period).[16] (ADN, ¶ 31.) Mr. Nayak was later diagnosed with Chronic Fatigue Syndrome, secondary to Chronic-Reactive Mononucleosis, which continues to date. (ADN, ¶¶ 31, 41, 43; Exs. O, T, W.) Specifically, Mr. Nayak battles fatigue, struggles to maintain focus and energy, has difficulty sustaining energy to perform basic tasks, and must take breaks during the day to replenish his energy level to perform daily tasks. (ADN, ¶¶ 41, 43.)

## III.   ARGUMENT.

### A.   Preliminary Injunction Standard.

A party seeking preliminary injunctive relief must demonstrate some likelihood of success on the merits, and that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied. Ty, Inc. v. The Jones Group, Inc., 237 F.3d 891, 895 (7th Cir. 2001) (citation omitted); see also Bucciarelli-Tieger v. Victory Records, Inc., No. 06 C 4258, 2007 U.S. Dist. LEXIS 39634, at *5 (N.D. Ill. May 17, 2007) (citing Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 11-12 (7th Cir. 1992)). If the moving party can meet these prerequisites, the court must then consider the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the

---

[15] UIC granted Mr. Nayak double-time to take his examinations.

[16] In May of 2006, Mr. Nayak received a Summer Fellowship from the American Academy of Allergy Asthma & Immunology. However, due to his continuing fatigue problems, he was forced to relinquish the Fellowship. (ADN, ¶ 32, Ex. P.)

irreparable harm to the moving party if relief is denied.[17] <u>Ty, Inc</u>., 237 F.3d 891 at 895.  The court must also consider the effect of the injunction on the interests of the public, meaning the consequences of granting or denying the injunction to non-parties.  <u>Bucciarelli-Tieger</u>, No 06 C 4258, 2007 U.S. Dist. LEXIS 39634 at *5.

The court is to employ a "sliding scale" analysis whereby "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." <u>Abbott Labs.</u>, 971 F.2d at 12.  A "likelihood of success" exists if the party seeking the injunctive relief shows that it has a "better than negligible" chance of succeeding on the merits.  <u>Washington v. Indiana High Sch. Ath. Ass'n</u>, 181 F.3d 840, 846 (7th Cir. 1999).  Furthermore, under the "sliding scale" analysis, if the balance of harms is clearly in its favor, the moving party need only demonstrate that it has a "better than negligible" chance of prevailing on the merits.  See <u>Omega Satellite Products Co. v. City of Indianapolis</u>, 694 F.2d 119, 123 (7th Cir. 1982).[18]

### 1. Mr. Nayak is Likely to Prevail on the Merits.

#### a. <u>Mr. Nayak has Disabilites Protected by the ADA.</u>

Pursuant to the ADA, a person has a disability if he has a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A).  The Department of Justice ("DOJ") has authority to implement regulations under Title III of the ADA.  42 U.S.C. § 12186(b).  The DOJ has promulgated regulations pursuant to Title III of the ADA that define "physical or mental impairment" as including "specific learning disabilities."  28 C.F.R. § 36.104 (1999).

DOJ regulations further define "major life activities" as including "walking, seeing, hearing, speaking, breathing, learning and working."  <u>Id.</u>  In interpreting these regulations, courts have

---

[17] The purpose of a preliminary injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." <u>Brown & Brown, Inc. v. Ali</u>, 494 F. Supp. 2d 943, 950 (N.D. Ill. 2007) (citing <u>Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.</u>, 149 F.3d 722, 726 (7th Cir. 1998)).

[18] The "better than negligible" standard "surely does not require a finding that it is more likely than not that one side will prevail." <u>Oxford Capital Illinois, L.L.C. v. Sterling Payroll Financial, L.L.C.</u>, No 01 C 1173, 2002 U.S. Dist. LEXIS 4372 at *12 n.2 (N.D. Ill. Mar. 15, 2002).  Thus, in the Seventh Circuit, the likelihood of success "threshold is low." <u>Roland Machinery Co. v. Dresser Industries, Inc.</u>, 749 F.2d 380, 387 (7th Cir. 1984).

concluded that the major life activity of learning includes reading and writing. See <u>Gonzalez v. Nat'l Bd. Of Med. Exam'rs</u>, 225 F.3d 620, 626 (6th Cir. 2000). Notably, courts have further interpreted "major life activities" to include concentrating and thinking. See <u>Nawrot v. CPC Int'l</u>, 277 F.3d 896, 907 (7th Cir. 2002); <u>Battle v. United Parcel Service, Inc.</u>, 438 F.3d 856, 861 (8th Cir. 2006); <u>Head v. Glacier Northwest Inc.</u>, 413 F.3d 1053, 1061 (9th Cir. 2005); <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296, 307 (3d Cir.1999). The ADA does not define when major life activities are considered "substantially limited," nor do the accompanying DOJ regulations. However, the DOJ regulations do state that an individual has a disability when that "individual's important life activities are restricted as to the *condition, manner, or duration* under which they can be performed in comparison to most people." 28 C.F.R., pt. 36, App. B (1991) (emphasis added).

Mr. Nayak is substantially limited in his abilities to read, concentrate and think. As described in detail above, Mr. Nayak has been diagnosed with, and experiences substantial limitations as a result of his ADHD. ADHD is a mental impairment that substantially limits Mr. Nayak's abilities to concentrate and think, which in turn inhibit his ability to read. The 2007 Evaluation of Mr. Nayak dramatically illustrates how his abilities to read, concentrate, and think are substantially limited by his ADHD:

> [T]he area most greatly impacted by his ADHD symptoms is his reading fluency and comprehension…This problem is evidenced by Mr. Nayak's performance on timed versus untimed reading comprehension tasks. For example, when given a limited amount of time to complete college-level reading passages and answer multiple choice questions, Mr. Nayak performed in the low average range, compared to undergraduates. This is significantly below expectations for an advanced medical student with a verbal comprehension IQ in the high range. When administered reading passages without time constraints, Mr. Nayak performed in the high average range, much more comparable to his verbal comprehension skills.

(AWS, ¶ 11, Ex. B, p 8.)

Mr. Nayak's score on the Nelson-Denny Reading Test in his 2007 Evaluation further demonstrates his serious limitations in the area of reading comprehension – he scored in the 23rd percentile in reading comprehension and the 19th percentile in reading rate on the test – these scores are well below the average scores of most people, and certainly well below the scores of Mr. Nayak's non-disabled peers in medical school**.**

This recent evidence is supported by the results of Mr. Nayak's psychological evaluation in 2002. In the 2002 Evaluation, Mr. Nayak's doctors found that while he is of "superior intelligence" he "experiences significant deficits in comprehension." (ADN, ¶ 23, Ex. J, pp 1, 3.) With respect to an evaluative test administered to Mr. Nayak, his doctors noted that:

> Allowing [Mr. Nayak] afterward to re-read each of the passages dramatically improved his comprehension. These results demonstrate that although [Mr. Nayak] reads adeptly, he experiences significant deficits in comprehension and must read and re-read material in order to acquire expected levels of understanding and retention of what he has read.

(Id. at 3-4.)

Years of anecdotal evidence reflecting Mr. Nayak's limited abilities in reading, concentrating and thinking are set forth in the records of his performance on standardized tests. As detailed above, the differential between Mr. Nayak's un-accommodated and accommodated SAT I and SAT II Writing and Math Level 1C scores were $170^{19}$, $310^{20}$ and $90^{21}$ points, respectively. These same types of testing accommodations resulted in a score differential on the MCAT that moved from the 10th percentile to the 59th-66th percentile.$^{22}$ Thus, what has proven effective time and time again in assisting Mr. Nayak with his ADHD, are reasonable testing accommodations.

Mr. Nayak's deficient abilities in reading, concentrating and thinking specifically impair the *condition, manner, or duration* under which he is able to perform these major life activities in comparison to most people. Because of his disabilities, Mr. Nayak is not able to read, concentrate and think in the same manner or with the same duration as most people. The USMLE Step 1 is a standardized test, structured for "most people" under very specific and rigorous conditions. The

---

19  Mr. Nayak received an aggregate score of 1170 when he took the SAT I in December of 1996 without testing accommodations and his aggregate score jumped to 1340 when he took the exam in December of 1997 with accommodations. (ADN ¶ 11, Ex. D.)

20  Mr. Nayak received a score of 350 when he took the SAT II Writing exam in November of 1994 without testing accommodations and his score jumped to 660 when he took the exam in January of 1998 with accommodations. (ADN ¶ 11, Ex. D.)

21  Mr. Nayak received a score of 650 when he took the SAT II Math Level 1C examination in May of 1997 without testing accommodations and his score jumped to 740 when he took the exam in November of 1997 with accommodations. (ADN ¶ 11, Ex. D.)

22  Notably, every time Mr. Nayak sat for the MCAT he was taking medication for his ADHD. Thus, medication has proven insufficient to address Mr. Nayak's reading disabilities. (ADN, ¶ 14.)

USMLE is not structured for people with disabilities, like Mr. Nayak, which is exactly why the ADA requires that testing accommodations be made available.

Mr. Nayak is also substantially limited in the major life activity of working, because the USMLE is a requirement for becoming a medical doctor. Medicine constitutes a broad class or range of jobs. The evidence clearly shows that Mr. Nayak's disabilities place him at risk of failing that entrance requirement, unless they are accommodated. When an individual is "significantly restricted in the ability to perform a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities," his major life activity of working is substantially limited. Biank v. Nat'l Bd. Of Med. Exam'rs, 130 F. Supp. 2d 986, 990-991 (N.D. Ill. 2000) (applying EEOC ADA Title I "substantial limitation" standard for major life activity of "working" to testing accommodation context and finding that USMLE Step 2 is a major life activity of working as a duly licensed medical doctor). A limitation in Mr. Nayak's ability to take the USMLE Step 1 exam will significantly restrict his ability to become a licensed medical doctor. This limitation substantially limits his ability to engage in the major life activity of working by excluding him unjustly from a broad class of jobs which require a medical degree.

In sum, Mr. Nayak has disabilities that preclude him from performing the tasks of reading, concentrating, thinking in a manner as compared to most people. Beyond these limitations, his disabilities substantially limit his ability to work as compared to other medical students with comparable training, skills and abilities. All medical students must take the USMLE Step 1 to become duly licensed medical doctors. Mr. Nayak is not like all other medical students and is distinctly disadvantaged if required to take the USMLE without accommodations.

    b.  <u>The NBME's Denial of Accomodations is a Violation of the ADA.</u>

The ADA specifically prohibits discrimination by "public accommodations,"[23] stating: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public

---

[23] The ADA defines "Public Accommodations" to include various private entities, such as museums, libraries, postgraduate institutions, restaurants and hotels, if the operations of such entities affect commerce. 42 U.S.C. §§ 12181(7)(A)-(L).

accommodation." 42 U.S.C. § 12182(a) The purpose of the ADA is to guarantee that individuals with disabilities are not disadvantaged because of their disabilities and to place those with disabilities on equal footing with others. D'Amico v. N.Y. State Bd. Of Law Exam'rs, 813 F. Supp. 217, 221 (W.D.N.Y. 1993) (granting preliminary injunction requring the New York State Board of Law Examiners to provide plaintiff reasonable testing accommodations on the bar exam based upon plaintiff's visual disability); see also, generally, Rush v. Nat'l Bd. Of Med. Exam'rs, 268 F. Supp. 2d 673, 677 (N.D. Tex. 2003) (granting preliminary injunction requiring the NBME to provide plaintiff the accommodations of extended time on the USMLE Step 1 based upon plaintiff's reading and processing disabilities and finding that this was necessary such that the plaintiff would "be effectively tested not on his disability but rather on his subject-matter knowledge.").

Pursuant to the ADA, discrimination specifically includes a failure to make reasonable accommodations to enable the person with a disability to participate in and benefit from the services, facilities, and accommodations the entity provides to others. 42 U.S.C. § 12182(b)(2)(A)(ii). In refusing to make reasonable modifications of its policies, practices, and procedures, which are necessary for the NBME to afford the same services to Mr. Nayak as it provides to others, the NBME is discriminating against Mr. Nayak.

DOJ regulations provide that examinations covered by this section be selected and administered to accurately reflect the individual's aptitude or achievement level rather than his or her impairment.[24] 28 C.F.R. § 36.309(b)(1)(i). Thus, those that administer these exams are required to place disabled test-takers on "equal footing" with non-disabled test takers. The regulations implementing Title III of the ADA further clarify that such accommodations "may include changes in the length of time permitted for completion of the examination." 28 C.F.R. § 36.309(b)(2). Mr. Nayak tailored his request to the NBME for extended test-taking time in an isolated environment directly to his evidenced difficulties in the areas of reading and distractibility. The requested accommodations are reasonable and would place Mr. Nayak on "equal footing" with his non-disabled peers by mitigating his

---

[24] DOJ Regulations state, "The purpose of this part is to implement Title III of the Americans with Disabilities Act of 1990 (42 U.S.C. 12181), which prohibits discrimination on the basis of disability by public accommodations and requires places of public accommodation and commercial facilities to be designed, constructed, and altered in compliance with the accessibility standards established by this part." 28 C.F.R. § 36.101.

- 11 -

disabilities in the testing environment. By refusing Mr. Nayak's request for reasonable testing accommodations, the NBME has refused to administer the USMLE Step 1 to him in an accessible manner such that the examination will reflect his true capabilities rather than his disabilities.

Accordingly, plaintiff has cleary met his burden of demonstrating a reasonable likelihood of success on the merits of his claims under the ADA.

### 2. Mr. Nayak Has No Adequate Remedy At Law And Will Suffer Irreparable Injury if a Preliminary Injunction is not Entered.

A plaintiff has no adequate remedy at law when an award of damages at the end of trial will be "seriously deficient as a remedy for the harm suffered." Roland Machinery v. Dresser Industries, 749 F.2d 380, 386 (7th Cir. 1984). See also Foodcomm Int'l v. Barry, 328 F.3d 300, 304 (7th Cir. 2003); Nano-Proprietary, Inc. v. Keesmann, No. 06 C 2689, 2007 U.S. Dist. LEXIS 7666, at *18 (N.D. Ill. Jan. 30, 2007). In the instant action, Mr. Nayak cannot obtain damages as Title III of the ADA does not even provide for such relief and instead solely provides for injunctive relief. [25]

The requirement of irreparable harm is met when the moving party will suffer harm during the pendency of the case "that cannot be prevented or fully rectified by the final judgment after trial." Roland Machinery, 749 F.2d at 386. Furthermore, "a conclusion that the injury is irreparable in turn establishes that there is no adequate remedy at law." Bordelon v. Chicago Sch. Reform Bd. of Trustees, No. 98 C 1932, 1998 U.S. Dist. LEXIS 7287, at *18-19 (N.D. Ill. May 8, 1998). This element is clearly present in this case.

UIC requires that students take the USMLE Step 1 before beginning their third year of medical school. (ADN, ¶ 55, Ex. AA.) Thus, the time for Mr. Nayak to take the USMLE Step 1 exam is now. If Mr. Nayak does not pass the USMLE Step 1, he must discontinue further third year clerkship activity. Id. at 5-6. In order to continue his medical school career and to be licensed as a practicing physician, Mr. Nayak must take and pass the USMLE Step 1 examination.

---

[25] 42 U.S.C. § 12188(a)(1) of the ADA incorporates the remedies set forth in 42 U.S.C. § 2000a-3(a). 42 U.S.C. § 2000a-3(a) provides that "a civil action for preventive relief, including an application for a permanent or temporary injunction" is available to an aggrieved party.

The result of Mr. Nayak taking the USMLE Step 1 without reasonable accommodations will most likely be a failing score,[26] or, at best, a much lower score than what would accurately reflect his true abilities. The consequence of a failing score is that Mr. Nayak will fall behind his peers in school, be forced to take time out from school to retake the USMLE Step 1, or even request a leave of absence from UIC to allow him to successfully complete the USMLE Step 1. Ultimately, if he is unable to pass the exam because his disabilities are not accommodated, Mr. Nayak would be asked to leave UIC and forced to give up his dream of becoming a medical doctor. The consequence of a much lower score would be that Mr. Nayak would not be able to participate in the residency programs that he is qualified to enter,[27] and thus he would be limited in his ability to participate in the medical residency programs of his choice.[28]

If Mr. Nayak is forced to take the USMLE Step 1 without reasonable accommodations, he will be at a distinct disadvantage as compared to those taking the exam who do not have his disabilities. As a result, Mr. Nayak's performance will not reflect his true abilities.

### 3.    The Harm to Mr. Nayak Outweighs any Harm to the NBME.

As described above, if the NBME is allowed to deny Mr. Nayak reasonable testing accommodations on the USMLE Step 1 he will be irreparably harmed. Comparatively, the NBME will suffer virtually no harm as a result of being required to provide Mr. Nayak reasonable testing accommodations and will be only be required to do what it must do under the ADA. The NBME has provided similar accommodations to test participants in the past[29] and providing an accommodation to

---

[26] A passing score on the USMLE Step 1 is 185. Minimum Passing Scores on USMLE Step Examinations, http://www.usmle.org/Scores_Transcripts/minimum_passing.html (last visited Jan. 30, 2008).

[27] Residency programs will use Mr. Nayak's score on the exam to determine whether he is a qualified candidate for their programs. Residency programs will be aware if Mr. Nayak fails the USMLE Step 1 on his first attempt, even if he is able to pass the examination on a subsequent attempt, and such failure will negatively impact Mr. Nayak's ability to gain access to any residency programs. (ADN, ¶ 53.).

[28] Mr. Nayak is specifically interested in the areas of internal medicine, emergency medicine and neurology, which are all highly competitive. The mean USMLE Step 1 score for medical students who obtain residencies in the areas of internal medicine, emergency medicine and neurology are 222, 221 and 218, respectively. (ADN, ¶ 53, Ex. Y, p 11.)

[29] The NBME includes check-mark boxes for both "Additional Testing Time – Time and one-half" and "Additional Testing Time – Double Time" on its standard application for testing accommodations. (ADN, ¶ 35, Ex. R.) Furthermore, in Rush v. Nat'l Bd. of Med. Exam'rs, 268 F. Supp. 2d 673 (N.D. Tex. 2003) a plaintiff was granted a preliminary injunction requiring the NBME to provide him with extended time on the USMLE Step 1 based upon the plaintiff's reading disability.

Mr. Nayak in this instance will do nothing to reduce the NBME's ability to administer tests as it always has to future students.  The harm Mr. Nayak will suffer in the absence of a preliminary injunction far outweighs any harm the NBME could possibly suffer if a preliminary injunction is granted and such relief should be entered.

### 4. A Preliminary Injunction is in the Public Interest.

The public interest will not be harmed by granting Mr. Nayak the requested emergency injunctive relief.  The ADA was enacted as a matter of public policy to ensure that disabled persons are treated fairly and provided with equal opportunities as compared to those in the community without disabilities.  42 U.S.C. § 12101.[30]  Mr. Nayak has disabilities covered by the ADA, and requiring the NBME to provide him reasonable testing accommodations will ensure that he is provided with equal opportunities as compared to his non-disabled medical school peers.  Requiring the NBME to provide Mr. Nayak reasonable testing accommodations will not detrimentally affect non-parties.  This Court should conclude that the public interest favors interim enforcement of the ADA as it applies to accommodations for professional examinations.

## IV.   CONCLUSION.

For the foregoing reasons, Mr. Nayak respectfully requests this Court to enter a prelmiianry injunction  requring the Defendant to provide him with reasonable accomodaitons in the upcoming USMLE Step 1 examination.  Specifically, Plaintiff requests that this Court order the NBME to provide Mr. Nayak with the reasonable testing accommodations he has requested on the USMLE Step 1: extended test taking time (double time), an isolated testing environment, and appropriately monitored breaks.

---

[30] The ADA states, "...discrimination against individuals with disabilities continue[s] to be a serious and pervasive social problem" and that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous…"). 42 U.S.C. § 12101 ("Congressional findings and purposes"); see also Rush, 267 F. Supp. 2d at 679 (finding that an injunction would  "... further the public interest in prohibiting discrimination by…entities, such as the [NBME], on the basis of disability by fulfilling the ADA's requirements that entities offering licensing examinations provide reasonable accommodations to disabled individuals").

Dated: January 31, 2008　　　　　　　　　Respectfully Submitted,

　　　　　　　　　　　　　　　　　　　　　*/s/   Mary E. Gardner*
　　　　　　　　　　　　　　　　　　　Mary E. Gardner
　　　　　　　　　　　　　　　　　　　John A. Litwinski
　　　　　　　　　　　　　　　　　　　McDermott Will & Emery LLP
　　　　　　　　　　　　　　　　　　　227 W. Monroe Street
　　　　　　　　　　　　　　　　　　　Chicago, IL  60606-5096
　　　　　　　　　　　　　　　　　　　Telephone:   312.372.2000
　　　　　　　　　　　　　　　　　　　Facsimile:   312.984.7700

　　　　　　　　　　　　　　　　　　　Karen I. Ward
　　　　　　　　　　　　　　　　　　　Equip for Equality
　　　　　　　　　　　　　　　　　　　20 N. Michigan, Suite 300
　　　　　　　　　　　　　　　　　　　Chicago, Illinois 60602
　　　　　　　　　　　　　　　　　　　Telephone:   312.341.0022
　　　　　　　　　　　　　　　　　　　Facsimile:   312.341.0295

　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff David A. Nayak*

**CERTIFICATE OF SERVICE**

I, Mary E. Gardner, an attorney, hereby certify that I caused a copy of the foregoing

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION** to be served by facsimile and federal express on this 31st day of January, 2008, addressed to the following:

National Board of Medical Examiners
Janet Carson, General Counsel
3750 Market Street
Philadelphia, Pennsylvania 19104-3104
Telephone:  215.590.9500
Facsimile:  215.590.9604


      /s/ *Mary E. Gardner*
      Mary E. Gardner

CHI99 4934174-1.009960.0305